2008 ND 140

**FORUM COMMUNICATIONS COMPANY, Petitioner**

v.

**The Honorable John T. PAULSON, Judge of the District Court, Southeast Judicial District, State of North Dakota, and Moe Maurice Gibbs, Respondents.**

No. 20080052.

Supreme Court of North Dakota.

July 7, 2008.

Steven A. Johnson (on brief), Michael T. Andrews (on brief), and David L. Tilden (on brief), Vogel Law Firm, Fargo, N.D., for petitioner.

Steven A. Storslee (on brief), Special Assistant Attorney General, Bismarck, N.D., for respondent the Honorable John T. Paulson.

Jonathan R. Byers (on brief), Assistant Attorney General, Office of Attorney Gen-

eral, Bismarck, N.D., for respondent State of North Dakota.

MARING, Justice.

[¶ 1] Forum Communications Company petitioned for a supervisory writ directing district court Judge John T. Paulson to vacate his order sealing juror questionnaires and any other information that would help identify the full names of jurors in the concluded Bismarck murder trial of Moe Maurice Gibbs. We exercise our original jurisdiction and issue a supervisory writ reversing the district court's order and directing the court to consider Forum Communications' request for information under the guidelines specified in this opinion.

I

[¶ 2] Gibbs was charged in Barnes County with murdering Valley City State University student Mindy Morgenstern in her Valley City apartment. The case was assigned to Judge Paulson, a district court judge in the Southeast Judicial District. Because of pretrial publicity, the district court moved the trial from Barnes County to Minot in Ward County. In June 2007, the court approved expanded media coverage of the trial, but issued an order restricting extrajudicial comments to the media or the public.

[¶ 3] Before trial, the State and Gibbs stipulated to use a thirty-four page jury questionnaire for prospective jurors to answer before trial to assist the parties in picking a jury. The questionnaire consisted of 169 questions divided into several broad categories, including personal information identifying the prospective juror, residence, family, education, employment, previous employment, personal, military, law enforcement and legal contacts, criminal justice system, juror service, and miscellaneous. The parties' stipulation said

the questionnaire "will not be filed and become a part of the Court's record in this matter. The proposed Jury Questionnaire shall be held strictly confidential, with the exception of distribution to Court personnel, attorneys-of-record for each of the parties and the parties." The district court approved the parties' stipulation, stating the "completed Jury Questionnaires shall not become part of the Court's file in this case. To the extent any completed Jury Questionnaires end up logged in the Court's file, the completed Jury Questionnaire(s) shall be sealed in an envelope and marked 'Confidential' and only to be opened pursuant to the terms of a subsequent order of the Court." The jury questionnaire included the following statement by the court to prospective jurors:

Some of these questions call for personal information. If you feel any question invades your right to privacy or is embarrassing to you, you may simply write "confidential" in the space provided. The Court will then give you an opportunity to answer that question in a closed hearing with the Court, the accused, the attorneys and the court reporter. The Court will do everything legally possible to protect your privacy.

This questionnaire is part of the jury selection process and, therefore, you must answer the questions under penalty of perjury.

[¶ 4] The parties do not dispute that the voir dire proceedings during the Minot trial were closed to the public and the media. During the Minot trial, Gibbs' trial counsel petitioned for a disorderly conduct restraining order against a third party attending the trial, and a district court judge for the Northwest Judicial District issued a disorderly conduct restraining order against the third party, a Bismarck resident. The Minot jury ultimately deadlocked on a verdict in the criminal prosecu-

tion of Gibbs. The district court initially rescheduled a second trial in Grand Forks County "because of the extensive pretrial and trial publicity in Barnes County . . . and the extensive trial coverage in Ward County . . . including comments by jurors and juror editorials."

[¶ 5] The district court eventually rescheduled the trial for Bismarck in October 2007, and the court issued a scheduling order requiring each prospective juror to complete the 169 question juror questionnaire utilized in the first trial. Forum Communications moved to open courtroom proceedings, including voir dire, to the public, to unseal court documents, including the completed jury questionnaires, and to vacate the gag order. The court ordered that the public would be allowed access to jury voir dire, subject to closure whenever counsel believed sensitive subjects would be discussed with prospective jurors. The court also unsealed a copy of a blank juror questionnaire distributed to the prospective jurors and indicated it would preserve, rather than destroy completed juror questionnaires. The court further ordered "as much public access to courtroom proceedings as possible," but "reserve[d] ruling on public access to specific matters that may be taken up in motion hearings, bench or chamber conferences or other special proceedings until such matters arise." The court also left intact the order restricting extrajudicial comments. The parties do not dispute that during approximately five days of jury selection in Bismarck, the public and the media were allowed to attend voir dire, subject to some *in camera* proceedings, but the jurors were referred to by their first names and the initial of their last name. After a lengthy trial, the Bismarck jury returned a November 2007, verdict finding Gibbs guilty. Gibbs appealed to this Court, and his appeal is pending.

[¶ 6] In December 2007 and January 2008, Forum Communications asked by letter the district court to release the names of the jurors in the Bismarck trial. The district court issued the following order:

Because the Court gave its word to the jurors in the above entitled matter that it would protect those jurors' identity as confidential. And because the Court had previous harassment problems of jurors and counsel from a Bismarck man when the case was tried in Minot, North Dakota, in order to protect the jurors as much as possible, the Court now enters the following Order.

IT IS HEREBY ORDERED, that the Clerk of District Court is to seal the juror questionnaires and any other identifying information that would help identify the full names of the jurors that participated in the Bismarck, Burleigh County, North Dakota retrial of the above captioned matter.

IT IS FURTHER ORDERED, that the records will remain sealed until such time as any appeal, or any ordered retrial and appeal therefrom have been determined.

Forum Communications petitioned this Court to exercise its original jurisdiction and issue a supervisory writ reversing the district court's order sealing juror information.

II

[¶ 7] Forum Communication argues the law presumes court records, including the jurors' names and the completed juror questionnaires, are public. Forum Communications claims the district court's order sealing juror information is contrary to law and creates an injustice, and it has no adequate alternative remedy but to request a supervisory writ.

[¶ 8]   In *Roe v. Rothe–Seeger*, 2000 ND 63, ¶ 5, 608 N.W.2d 289, this Court outlined standards for this Court's discretionary exercise of its original jurisdiction to issue supervisory writs in extraordinary cases in which there is no adequate alternative remedy:

> Our authority to issue supervisory writs derives from N.D. Const. art. VI, § 2, and N.D.C.C. § 27–02–04.  *Dimond v. State Bd. of Higher Educ.*, 1999 ND 228, ¶ 19, 603 N.W.2d 66.  The authority to issue supervisory writs is discretionary; it cannot be invoked as a matter of right.  *Trinity Med. Ctr. v. Holum*, 544 N.W.2d 148, 151 (N.D.1996); *Odden v. O'Keefe*, 450 N.W.2d 707, 708 (N.D. 1990).  This Court determines whether it should exercise its original jurisdiction to issue remedial writs on a case-by-case basis.  *Heartview Found. v. Glaser*, 361 N.W.2d 232, 234 (N.D.1985); *Marmon v. Hodny*, 287 N.W.2d 470, 474 (N.D.1980).  Courts generally will not exercise supervisory jurisdiction "where the proper remedy is an appeal merely because the appeal may involve an increase of expenses or an inconvenient delay."  *Fibelstad v. Glaser*, 497 N.W.2d 425, 429 (N.D.1993).  We exercise our authority to issue supervisory writs rarely and cautiously, and only to rectify errors and prevent injustice in extraordinary cases in which there is no adequate alternative remedy.  *State ex rel. v. Hagerty*, 1998 ND 122, ¶ 6, 580 N.W.2d 139.

[¶ 9]   We conclude this is an appropriate case to exercise our original jurisdiction because this case involves issues of vital concern about the interrelationship of guidelines for public and media access to court records, for juror privacy, and for a criminal defendant's right to a fair trial, and because there is no adequate remedy by appeal to resolve those issues.

### III

[¶ 10]   Forum Communications argues the district court's decision is contrary to law and creates an injustice because the public and the media have a right of access to criminal proceedings, including juror information, under N.D. Sup.Ct. Admin.  R. 41, and the state and federal constitutions.  Forum Communications claims the district court did not identify an overriding interest for sealing the information, and the court made no findings to suggest there was an ongoing threat of harassment of the Bismarck jurors.  Forum Communications contends the court did not consider reasonable alternatives, nor did it consider if the order was the least restrictive means of accomplishing an overriding interest.

[¶ 11]   During the trial, the district court kept all records listing the names of the jurors confidential.  The court's right to do so is not at issue in this proceeding.  The only issue is whether the district court's post verdict order sealing the juror questionnaires and any other identifying information violated the law.  It is now firmly established that the general public and the media have a constitutional right of access to criminal trials.  *Waller v. Georgia*, 467 U.S. 39, 44–45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 558–81, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).  In *Globe*, at 604–606, 102 S.Ct. 2613 (citations and footnotes omitted) the United States Supreme Court explained the rationale for public access to criminal trials:

> Underlying the First Amendment right of access to criminal trials is the common understanding that "a major purpose of that Amendment was to protect

the free discussion of governmental affairs." By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government. Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected "discussion of governmental affairs" is an informed one.

Two features of the criminal justice system, emphasized in the various opinions in *Richmond Newspapers,* together serve to explain why a right of access to *criminal trials* in particular is properly afforded protection by the First Amendment. First, the criminal trial historically has been open to the press and general public. "[A]t the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." And since that time, the presumption of openness has remained secure. Indeed, ... the presumption was so solidly grounded that the Court was "unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." This uniform rule of openness has been viewed as significant in constitutional terms not only "because the Constitution carries the gloss of history," but also because "a tradition of accessibility implies the favorable judgment of experience."

Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

. . . .

*Although the right of access to criminal trials is of constitutional stature, it is not absolute.* But the circumstances under which the press and public can be barred from a criminal trial are limited; *the State's justification in denying access must be a weighty one. Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.*

(Emphasis added.)

[¶ 12] The United States Supreme Court has explicitly held that jury voir dire is part of a criminal trial and is subject to the same right of access by the public and the media. *Press–Enterprise,* 464 U.S. at 505, 104 S.Ct. 819. In *Press–Enterprise,* at 503, 104 S.Ct. 819, a trial court in a California murder trial had closed all but three days of six weeks of jury voir dire. After the jury was selected, Press–Enterprise sought release of a transcript of the closed portion of jury selection. *Id.* The prosecution and defense counsel both objected, claiming the closed voir dire involved personal and sensitive issues for the individual jurors. *Id.* at 504, 104 S.Ct. 819. They asserted the release of the transcript would violate the jurors' right of privacy because the prospective jurors had an-

swered questions under an "implied promise of confidentiality." *Id.*

[¶ 13] The Supreme Court traced the origins of public trials and said there was a presumption that jury selection be as open to the public as any other part of a criminal trial. *Id.* at 505–10, 104 S.Ct. 819. The Court set forth a balancing test and explained:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 510, 104 S.Ct. 819.

[¶ 14] In *Press–Enterprise*, 464 U.S. at 511–12, 104 S.Ct. 819, the Court, in framing the standard necessary to overcome the presumption of openness, recognized the alleged murder also involved claims of rape of the victim, and jury selection "may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain." The Court explained prospective jurors' privacy interests must be balanced against historic values and the need for openness in the process:

> To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the

problem to the judge *in camera* but with counsel present and on the record.

> By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy. This process will minimize the risk of unnecessary closure. The exercise of sound discretion by the court may lead to excusing such a person from jury service. When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment.

*Id.* at 512, 104 S.Ct. 819.

[¶ 15] In *Press–Enterprise*, 464 U.S. at 513, 104 S.Ct. 819, the trial court closed voir dire without considering alternatives to closure and thereafter declined to release a transcript of the proceeding without explaining why the denial was not limited to information that was actually sensitive and deserving of privacy protection. Because the trial court had failed to articulate findings with the requisite specificity or consider alternatives to closure and total suppression of the voir dire transcript, the Supreme Court remanded for proceedings not inconsistent with its opinion. *Id.*

[¶ 16] The right of public access articulated in *Press–Enterprise* has been applied to preliminary jury questionnaires. *See, e.g., United States v. King,* 140 F.3d 76, 82 (2nd Cir.1998); *Cable News Network, Inc.*

*v. United States*, 824 F.2d 1046, 1047 (D.C.Cir.1987); *Dayton Newspapers, Inc. v. United States*, 109 F.Supp.2d 768, 771–72 (S.D.Ohio 1999); *Bellas v. Superior Court*, 85 Cal.App.4th 636, 102 Cal.Rptr.2d 380, 385 (2000); *Lesher Commc'ns, Inc. v. Superior Court*, 224 Cal.App.3d 774, 274 Cal.Rptr. 154, 155 (1990); *Beacon Journal Publ'g Co. v. Bond*, 98 Ohio St.3d 146, 781 N.E.2d 180, 188–89 (2002). The foregoing authorities establish that the public and the media have a presumptive right of access to juror questionnaires that is not absolute and must be balanced against a defendant's right to a fair trial and jurors' privacy interests; that the presumption of openness can only be overcome by an overriding interest and must be articulated with findings specific enough to permit effective review, and that any closure must be narrowly tailored to serve the competing interests.

[¶ 17] Also related to the asserted right of access to juror names is N.D.C.C. § 27–09.1–09(3), of the Uniform Jury Selection and Service Act, which requires public access to jurors' names unless the interests of justice requires the names be kept confidential and states, in part:

> The names of qualified jurors and the contents of jury qualification forms completed by those jurors shall be made available to the public unless the court determines in any instance that this information in the interest of justice should be kept confidential or its use limited in whole or in part.

Other jurisdictions have interpreted the "interests-of-justice" standard to mean that "the trial court find specific and convincing reasons why, in the particular case, the juror identities are required to be withheld," and that "withholding should occur only in an exceptional case." *In re Globe Newspaper Co.*, 920 F.2d 88, 93 (1st Cir.1990).

[¶ 18] This Court has promulgated N.D. Sup.Ct. Admin. R. 41, for public access to "court records," which are defined to include "any document, information, or other thing that is collected, received, or maintained by court personnel in connection with a judicial proceeding." N.D. Sup.Ct. Admin. R. 41(2)(a)(1). Rule 41, N.D. Sup.Ct. Admin. R., provides, in part:

> Section 1. Purpose. The purpose of this rule is to provide a comprehensive framework for public access to court records. Every member of the public will have access to court records as provided in this rule.
>
> . . . .
>
> Section 3. General Access Rule.
>
> (a) Public Access to Court Records.
>
> (1) Information in the court record is accessible to the public except as prohibited by this rule.
>
> . . . .
>
> Section 5. Court Records Excluded From Public Access. The following information in a court record is not accessible to the public:
>
> . . . .
>
> (b) Information that is not accessible to the public under state law, court rule, case law or court order, including:
>
> . . . .
>
> (5) *names of qualified or summoned jurors and contents of jury qualification forms if disclosure is prohibited or restricted by order of the court;*
>
> (6) *records of voir dire of jurors unless disclosure is permitted by court order or rule;*
>
> . . . .
>
> (d) A member of the public may request the court to allow access to information excluded under Section 5 as provided in Section 6.

Section 6. Requests to Prohibit Public Access to Information in Court Records or to Obtain Access to Restricted Information.

(a) Request to Prohibit Access.

(1) *A request to prohibit public access to information in a court record may be made by any party to a case, by the individual about whom information is present in the court record, or on the court's own motion on notice as provided in Section 6(c).*

(2) *The court must decide whether there are sufficient grounds to overcome the presumption of openness of court records and prohibit access according to applicable constitutional, statutory and case law.*

(3) *In deciding whether to prohibit access the court must consider that the presumption of openness may only be overcome by an overiding interest. The court must articulate this interest along with specific findings sufficient to allow a reviewing court to determine whether the closure order was properly entered.*

(4) *The closure of the records must be no broader than necessary to protect the articulated interest. The court must consider reasonable alternatives to closure, such as redaction or partial closure, and the court must make findings adequate to support the closure. The court may not deny access only on the ground that the record contains confidential or closed information.*

(5) *In restricting access the court must use the least restrictive means that will achieve the purposes of this rule and the needs of the requestor.*

(b) Request to Obtain Access.

(1) A request to obtain access to information in a court record to which access is prohibited under Section 4(a), 5 or 6(a) may be made by any member of the public or on the court's own motion on notice as provided in Section 6(b).

(2) In deciding whether to allow access, the court must consider whether there are sufficient grounds to overcome the presumption of openness of court records and continue to prohibit access under applicable constitutional, statutory and case law. In deciding this the court must consider the standards outlined in Section 6(a).

(Emphasis added.)

[¶ 19] Under N.D. Sup.Ct. Admin. R. 41(5)(b)(5), the names of qualified or summoned jurors and contents of jury qualification forms are open to the public unless by court order disclosure is prohibited or restricted. Under N.D. Sup.Ct. Admin. R. 41(5)(b)(6), records of juror voir dire are not open to the public, unless by court order disclosure is permitted. When a request for public access is made, a court must decide whether there are sufficient grounds to overcome the presumption of openness of court records and may prohibit access according to applicable constitutional, statutory, and case law. N.D. Sup. Ct. Admin R. 41(6)(b). In deciding whether to permit or prohibit access, the court must consider that the presumption of openness may be overcome only by an overriding interest, which must be articulated along with specific findings sufficient to allow a reviewing court to determine whether the closure order was properly entered. *Id.* A closure order must be no broader than necessary to protect the articulated interest; the court must consider reasonable alternatives to closure, such as redaction or partial closure; and the court must make findings adequate to support the closure. *Id.* In restricting access, the court must use the least restrictive means that will achieve the purposes of the rule and the needs of the requestor. *Id.* The provisions of N.D. Sup.Ct. Admin. R.

41(5)(b)(5) and (6)(a) are consistent with the constitutional right of access to a criminal trial articulated in United States Supreme Court precedent and the requisite balancing of interests required by that precedent.

[¶ 20] Here, the district court's decision to seal any and all information pertaining to identification of the jurors was based on its articulated reasons of giving "its word to the jurors ... that it would protect those jurors' identity as confidential" and "previous harassment problems of jurors and counsel from a Bismarck man when the case was tried in Minot." We conclude those reasons, by themselves, are insufficient to rebut the presumption of openness and to warrant a blanket closure in this case. A blanket promise of protection from public disclosure of information on jury questionnaires is not legally effectual where public access is mandated under the constitution. *See Bellas*, 102 Cal.Rptr.2d at 391–92. Courts have recognized that the general public and the media have a qualified First Amendment right of post-verdict access to jurors' names, which may be limited by articulated findings to protect juror privacy or safety. *United States v. Doherty*, 675 F.Supp. 719, 723 (D.Mass.1987); *Commonwealth of Pennsylvania v. Long*, 592 Pa. 42, 922 A.2d 892, 901–05 (2007); *In re Juror Names & Addresses*, 233 Mich.App. 604, 592 N.W.2d 798, 808–09 (1999); *Beacon Journal Publ'g Co.*, 781 N.E.2d at 191–95. The parties have cited nothing in this record to suggest there were harassment problems of the jurors at any point during the Bismarck trial or any impending threats of juror harassment or safety threats after the verdict. The trial is now over and the jury has been discharged. The district court's decision did not articulate any specific findings to support closure to protect juror privacy or safety

after the jury was discharged. *See also* N.D.C.C. § 27–09.1–09; *In re Globe Newspaper*, 920 F.2d at 98 (holding interests-of-justice standard was not met and jurors' names must be released); *but see United States v. Black*, 483 F.Supp.2d 618, 622–30 (N.D.Ill.2007) (holding there is no qualified First Amendment right of access to jurors' names during a criminal trial). We conclude the district court's rationale for sealing the names of the jurors sitting on the Bismarck trial after the jury was discharged was insufficient to overcome the presumption of public access. We therefore conclude the names of the jurors who were sworn and tried the case to verdict must be released after notice to each of the jurors who sat on the Bismarck case that their names will be released and it is their choice whether to talk to the public or to the media.

[¶ 21] We also conclude the findings of the district court do not support a blanket closure of the Bismarck trial jurors' questionnaires. We agree with those jurisdictions that have applied the First Amendment right of public access to juror questionnaires and their reasoning that a written questionnaire serves as an alternative to oral disclosure of the same information in open court and is, therefore, synonymous with, and a part of, voir dire. *Bellas*, 102 Cal.Rptr.2d at 390; *Beacon Journal Publ'g Co.*, 781 N.E.2d at 188. We understand the desire of the trial judge "to protect jurors' privacy interest, whether it be content-based or the desire for anonymity." *Bellas*, at 391. However, such interest must be balanced against the right to access under the *Press–Enterprise* test. We recognize that the use of expanded questionnaires is a valuable tool and viewed as a way of obtaining extremely personal and sometimes embarrassing information from prospective jurors in criminal cases in a more palatable manner

than in open court. We suggest that these expanded jury questionnaires be accompanied, such as was done in this case, by a paragraph that states in unambiguous language that the questionnaires will become public records and, as an alternative to writing in sensitive personal data to a question, jurors can respond to the question by requesting a closed appearance before the judge with counsel and the accused present. The court can have the *in camera* hearing transcribed and then decide if that portion of jury selection should be available or access denied based on the showing required under *Press–Enterprise*. The trial court must not offer a guarantee of protection from public disclosure of information contained in juror questionnaires.

[¶ 22] We conclude a remand is appropriate for the court to consider the questionnaires of the jurors who sat on the Bismarck jury and to determine if an overriding interest for closure overcomes the presumption of openness under *Press–Enterprise* and N.D. Sup.Ct. Admin. R. 41. The district court must articulate specific findings to establish whether the presumption of access has been rebutted with regard to any questions or categories of the questionnaire. Any closure must be no broader than necessary to protect the articulated interest and the court must consider reasonable alternatives to closure. We hold, at a minimum, however, that recognized privacy concerns require redaction from the questionnaires of the jurors' date of birth, and addresses and telephone numbers that are not generally available to the public. We also direct the district court to consider for possible redaction as a least restrictive means for public access, questions 64 through 67 pertaining to medications, questions 91 through 96 pertaining to whether the juror was a victim of a crime, and questions 140 through 142 pertaining to racial and ethnic groups. If the

court redacts any responses to those questions, or any other questions, the redaction must be made for those responses on all questionnaires.

## IV

[¶ 23] We exercise our original jurisdiction and issue a supervisory writ reversing the district court's order and directing the court to consider Forum Communications' request for information under the guidelines specified in this opinion.

[¶ 24] GERALD W. VANDE WALLE, C.J., EVERETT NELS OLSON, S.J., WILLIAM F. HODNY, S.J., and DANIEL J. CROTHERS, J., concur.

[¶ 25] The Honorable WILLIAM F. HODNY, S.J., and EVERETT NELS OLSON, S.J., sitting in place of KAPSNER, J., and SANDSTROM, J., disqualified.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 26] I agree with and have signed the opinion written for the Court by Justice Maring because I believe the law we cite requires the result reached by the opinion. In addition to the authority cited in our opinion, N.D. Sup.Ct. Admin. R. 9 also is involved in the jury selection procedure in this State. Rule 9(5), N.D. Sup.Ct. Admin. R., provides that the administration and management of the jury system must comply with the Standards Relating to Juror Use and Management which are incorporated in the rule as an Appendix. Standard 7 governs voir dire and subsection (a) of that standard provides that basic background information should be made available in writing to counsel or each self-represented party "unless disclosure is limited by the court in accordance with Section 27–09.1–09, N.D.C.C." As our opinion notes, that section provides, at subsec-

tion 3, that the names of qualified jurors and the contents of jury qualification forms completed by those jurors "shall be made available to the public unless the court determines in any instance that this information in the interest of justice should be kept confidential or its use limited in whole or in part."

[¶ 27] Standard 7(c) requires the judge to "ensure that the privacy of prospective jurors is reasonably protected, and that the questioning by counsel is consistent with the purpose of the voir dire process."

[¶ 28] Rule 9(3), N.D. Sup.Ct. Admin. R., provides that the State Court Administrator, after consultation with the Jury Standards Committee, shall file a jury selection plan with the Clerk of the North Dakota Supreme Court and further provides that plan "shall detail the procedures to be followed in selecting and managing jurors in order to implement the policies set forth in N.D.C.C. Ch. 27–09.1," the Uniform Jury Selection and Service Act. Although that plan contains a brief qualification form for determining whether or not a juror is qualified to serve, it does not define the scope of the jury questionnaire. Rather, Section V of the Jury Selection Plan provides that "The questions on the qualification form shall be limited to those questions which may disqualify a person from jury service." Those questions ask whether the prospective juror is a citizen, a resident of the State and the county in which the trial is to be held, age, physical or mental disability which would affect the ability to serve or which would require special accommodations and whether the prospective juror has lost the right to vote because of current imprisonment.

[¶ 29] Subsection 3(b) of Section V of the plan states: "Questions which do not directly address the determination of qualifications should not be on the qualification form, but may be on the juror questionnaire."

[¶ 30] Thus the Jury Selection Plan recognizes a distinction between the juror qualification form which is to contain only questions as to the qualifications of the prospective juror to sit on any jury and the questionnaire which seeks information that the parties or their attorneys will use in determining whether or not the prospective juror should be challenged for cause or peremptorily removed from a panel in a particular case. It is this questionnaire which may ask questions the answers to which should remain confidential because of juror privacy.

[¶ 31] Here, the parties with the approval of the district judge used an "expanded" jury questionnaire, expanded as our opinion notes to 34 pages of questions.

[¶ 32] I write to note that our opinion may have unintended consequences. In an effort to "reasonably" protect the privacy of prospective jurors the district court, in future cases, may be unwilling to allow such an "expanded" jury questionnaire. While counsel or the self-represented party may ask those questions during voir dire in open court, it is problematic that they will ask each juror 34 pages of questions during that time or that the district judge will allow that depth of questioning in view of the court's responsibility to reasonably protect the juror's privacy. Thus the agreement to keep the questionnaires confidential has some logical purpose. However, as our opinion notes, the sweep of confidentiality is too great. Prospectively, if the expanded questionnaires are used, our opinion indicates at ¶ 22, some, but certainly not all, specific information may be held confidential. Thus jurors as well as the media and the public will be informed before the fact.

[¶ 33] As our opinion and this writing indicate, there is a balancing process at

work between the public's right to access and the juror's right to privacy and that process is, initially, the responsibility of the trial court. Our opinion will hopefully provide guidance to the trial courts as well as to the parties, counsel and the public who seek access to the juror information.

[¶ 34]  GERALD W. VANDE WALLE, C.J., concurs.